Mr. and Mrs. Hugo W.
SCHOELLKOPF, III,
Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 634–85L.

United States Claims Court.

Jan. 6, 1987.

George C. Chapman, Dallas, Tex., for plaintiffs.

Paul J. Ehlenbach, with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen, and Thomas W. Petersen, Washington, D.C., for defendant. Janet A. Wade, Office of the Solicitor, Dept. of the Interior, of counsel.

## OPINION

BRUGGINK, Judge.

This is an action to recover costs associated with the transfer of title of land to the United States in a condemnation proceeding. At issue is whether reimburseable expenses under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §§ 4601–4655 (1982) ("Relocation Act") encompass increased interest costs and various other charges associated with the renegotiation of a mortgage covering the property prior to condemnation by the United States.

Pending presently before the court are the parties' cross motions for summary judgment. After reviewing the pleadings and submissions of the parties, for reasons set forth below, the court concludes that there is no genuine issue as to any material fact, and that defendant is entitled to judgment as a matter of law.

## I. BACKGROUND

The following facts are not in dispute.

In December 1972, plaintiff[1] Hugo Schoellkopf mortgaged a portion of his property, approximately 9,381 acres, to John Hancock Mutual Life Insurance Company (Hancock). The mortgage secured a note in the principal amount of $320,000.00, bearing interest at 8 percent per year. The mortgage did not contain a provision for a prepayment penalty.

Beginning sometime in 1979, Schoellkopf engaged in discussions with defendant and the State of Oklahoma concerning the possible taking of a portion of his land for construction of a reservoir. In a letter dated April 16, 1980, the Department of Interior (DOI) offered Schoellkopf $1,880,-945.00 for the purchase of 8,019 acres. Of the land sought, approximately 5,381 acres were encumbered by the Hancock mortgage.

Schoellkopf and defendant were unable to reach agreement on a voluntary purchase. In a letter to Hancock dated September 15, 1980, Schoellkopf notified the mortgagee that defendant was about to condemn the land and the matter would be "settled in court." Schoellkopf pointed out that the government would be depositing approximately $250.00 per acre in court, less the amount required to pay off lienholders such as Hancock. Schoellkopf proposed that Hancock accept $156,000.00, which would in effect be a pro rata prepayment toward the $268,794.00 balance due on the note with respect to the 5,381 acres.

Although it is not clear from the record whether any negotiations took place between Schoellkopf and Hancock in the ensuing weeks, it is clear that on October 16, 1980, Hancock sent Schoellkopf an "Application for Partial Release." That document, which Schoellkopf signed on October 20, 1980, treated his request as one for a partial release pursuant to a negotiated sale of land to the government. On November 12, 1980, however, Hancock additionally required execution of an "Agreement Adjusting Loan Terms." This document, signed by Schoellkopf in November 1980,[2] confirmed the partial release, but maintained the then existing mortgage balance. It made three changes in the note and mortgage terms: it increased the interest rate from 8 to 10 percent per year; it required semi-annual instead of annual payments; and it called for early payment of the sum otherwise due on January 1, 1981.

---

1. It is not clear from the record what interest Mrs. Schoellkopf has in the property.

2. The precise date is not shown. Nor is the date it was executed by Hancock. Schoellkopf's affidavit avers it was finalized in January 1981 but that the release was not delivered until April 23, 1981.

In most other respects the earlier note and mortgage were confirmed. Schoellkopf made the January payment nine days early, and paid other expenses to Hancock and a title insurance company before receiving the release on April 23, 1981.

Meanwhile, defendant was proceeding with its condemnation action. On April 30, 1981, a complaint in condemnation was filed in district court naming as defendants plaintiffs here and all other "claimants" to the land. Attached as one of the interests to be taken was the mortgage held by Hancock. Estimated compensation deposited at the time was $2,100,000.00.

## II. THE CLAIM

Section 303 of the Relocation Act provides for the reimbursement of certain expenses incidental to the transfer of title to the United States:

The head of a Federal agency, as soon as practicable after the date of payment of the purchase price or the date of deposit in court of funds to satisfy the award of compensation in a condemnation proceeding to acquire real property, whichever is the earlier, shall reimburse the owner, to the extent the head of such agency deems fair and reasonable, for expenses he necessarily incurred for—

(1) recording fees, transfer taxes, and similar expenses incidental to conveying such real property to the United States;

(2) penalty costs for prepayment of any preexisting recorded mortgage entered into in good faith encumbering such real property;

. . . .

42 U.S.C. § 4653.

On August 10, 1982, plaintiffs filed a claim with the Bureau of Reclamation for reimbursement for prepayment penalties and specific incidental expenses pursuant to § 4653. Plaintiffs sought reimbursement for the following costs:

1. additional interest on the renegotiated mortgage in the amount $50,656.78 for the period January 1, 1981, to December 31, 1982 resulting from the increase in interest rate from 8 to 10%;

2. a $500 handling fee paid to Hancock;

3. loss of use of monies resulting from semi-annual rather than annual payments for a period of 12 years;

4. loss of the use of $25,759.96 for 9 days because of paying interest on December 23 rather than the following January 1, resulting in the loss of an opportunity to invest that money at 21.5 percent and realize $183.46;

5. expenses resulting from trips to the property in the amounts of $154, $160, and $396;

6. $25 paid to a title company for processing the Hancock mortgage release; and

7. fees paid to the Pushmataha County Abstract Company and to the Atoka Abstract Company in the respective amounts of $388 and $10.

On May 9, 1983, the Bureau denied these claims. Plaintiffs appealed the decision to the DOI Office of Hearings and Appeals. The appeal was denied on July 31, 1984 in Uniform Relocation Assistance Appeal of Mr. and Mrs. Hugo W. Schoellkopf III, 5 OHA 342 (U.S. Dept. of Interior, 1984).

On October 25, 1985, plaintiffs filed their complaint in this court seeking recovery for these same amounts. Under subsection 1 of § 4653, plaintiffs seek reimbursement for the costs of the following items as expenses "similar" to recording fees or transfer taxes: trip expenses in connection with the renegotiation, the release fee, and various payments to title and abstract companies. Plaintiffs contend that these expenses are similar to recording fees or transfer taxes because they were necessary to document the release transaction.

Under subsection 2 plaintiffs seek reimbursement for the following items as "prepayment penalties": increased interest costs to be incurred over the life of the loan by virtue of the change from eight to ten per cent interest rate, loss of use damages arising from the change to a semi-annual from an annual payment schedule, and loss of use damages arising from the pay-

ment of the loan installment nine days early.

## III. DISCUSSION

To recover under either subsection relied upon by plaintiffs, expenses must have been necessarily incurred. In addition, with respect to the largest amounts sought—the additional interest and loss of use claims—the expenses must constitute "prepayment" penalties. A review of the facts and relevant law demonstrates that plaintiffs' claims are deficient in both respects.

■ It is fundamental that a condemnation extinguishes *all* interests in a piece of property and vests absolute title in the government. *A.W. Duckett & Co. v. United States,* 266 U.S. 149, 151, 45 S.Ct. 38, 38, 69 L.Ed. 216 (1924); *United States v. Herring,* 750 F.2d 669, 671 (8th Cir.1984); *Travis v. United States,* 152 Ct.Cl. 739, 744, 287 F.2d 916, 919, *cert. denied,* 368 U.S. 824, 82 S.Ct. 42, 7 L.Ed.2d 28 (1961); *United States v. 3,276.21 Acres of Land,* 194 F.Supp. 297, 300 (S.D.Ca.1961). This occurs on the date the declaration is filed—in this case, April 30, 1981. *See United States v. 125.2 Acres of Land,* 732 F.2d 239, 244 (1st Cir.1984); *Covered Wagon, Inc. v. Commissioner of Internal Revenue,* 369 F.2d 629, 633 (8th Cir.1966).

■ Any mortgages outstanding on the property at the time of taking are consequently extinguished unless specifically excluded by the complaint in condemnation. Depending upon local law or the terms of the mortgage agreement, the mortgagee would either have an action against the landowner, or would retain a lien in the proceeds. In any event the land is no longer encumbered by mortgages. *See generally* J. Sackman, Nichols' Law of Eminent Domain, § 5.18 (rev. 3rd ed. 1985).

■ Title to the land in question passed by condemnation and not purchase. Therefore, from the standpoint of the defendant,

the fact that plaintiffs obtained a release prior to condemnation was of no consequence. If there had been no release, Hancock's mortgage would have been extinguished when the condemnation action was filed. It would then have had a lien against the estimated compensation deposited in court.

While that result would have been compelled by law, it was in any event called for by the mortgage agreement between plaintiffs and Hancock. That document clearly provided a lien in favor of Hancock against any proceeds of the condemnation award:

> [A]ll awards received as compensation for the taking of title to or any interest in the premises or any part thereof ... by virtue of the right of eminent domain or otherwise, are hereby assigned to the mortgagee; and ... at its option, the mortgagee may collect and receive the proceeds thereof and apply the whole or any part thereof to the payment of any amounts secured by this mortgage, whether then due or not, and release to the mortgagor any proceeds not so applied.

The agreement itself thus recognizes that the effect of a condemnation is to release the *land* automatically from the mortgage.[3] Hancock would simply have collected the unpaid principal, or some lesser portion thereof, out of the $2,606,233.00 ultimately awarded to the plaintiffs.

Plaintiffs contend that the mortgage agreement did not contain any provision for a *partial* release and since the Government "condemned only a part of plaintiffs' land, plaintiffs had to negotiate the loan for the remaining land." Plaintiffs' Response to Defendant's Cross Motion for Summary Judgment at 4. In light of the mortgage clause quoted above, this statement is inaccurate. More importantly, it is wide of the mark. As is their statement that Hancock refused to grant the release absent their capitulation to the "Agreement Adjusting Loan Terms." With re-

---

**3.** In construing a very similar clause, the court in *United States v. Burrough of Manhattan,* 225 F.Supp. 498, 504 (S.D.N.Y.1964), held that the

"mortgagee is obligated to accept the amount of the award and apply it to the satisfaction of the mortgage debt."

spect to whether plaintiffs' expenses were necessary to the *condemnation,* these statements are irrelevant. Plaintiffs did not have to renegotiate anything in connection with the condemnation. By operation of law and the terms of the agreement itself, a release was totally unnecessary. Plaintiffs simply chose to take advantage of the earlier loan's low interest rate, as is made clear in Schoellkopf's affidavit:

> [T]o have prepaid the entire mortgage would have been imprudent, inefficient, and inexpeditious, as prepayment would have prevented the continued and uninterrupted use of funds borrowed at eight per cent (8%) ... at a time when the replacement of those funds would have been at a cost greatly in excess of the eight percent (8%) rate being charged.

Similarly, in plaintiffs' response brief (p. 5), they assert, "Plaintiffs have been forced to relinquish a right to have available the proceeds of an existing mortgage at a rate more favorable than a later mortgage."

The court concludes that all of the expenses claimed are subject to the deficiency that they were not necessary to the condemnation. The record shows that they were incurred in connection with a voluntary renegotiation.

 Having concluded that all the claims are barred as not having been "necessary" to the condemnation, the court need not address the allowability of amounts claimed for travel expenses, title company costs, or Hancock's "handling fee." Because of the size of the amounts claimed as prepayment penalties, however, the court will address a second and independent deficiency which also bars plaintiffs from recovering with respect to amounts sought under subsection 2 of § 4653. The simple answer to this aspect of the claim is that plaintiffs did not prepay their loan. The pleadings do not make a pretense on this point. The transaction is forthrightly referred to as a "renegotiation." The loan adjustment agreement merely severed the

part of the collateral targeted by the impending condemnation and maintained the outstanding loan balance on diminished security. Nothing could be plainer than that plaintiffs wished to do everything possible to *avoid* prepaying the loan. This was not prompted by the need to avoid a prepayment clause—the mortgage and note did not contain one. Rather, plaintiffs admit to making an economic decision not to pay the mortgage balance in order to maintain an outstanding line of credit.

Plaintiffs argue that the ameliorative purposes of the Relocation Act are advanced by a generous reading of the term "prepayment." Plaintiffs' purposes are only advanced, however, if the term is ignored, not if it is merely read liberally. The record cannot sustain a finding that there was a prepayment of any kind. Both before and after the renegotiation plaintiffs had a note with Hancock with the same outstanding balance. To conclude that there was a prepayment would be totally at odds with the facts and the terms of the Relocation Act.[4]

### IV. CONCLUSION

For the foregoing reasons Plaintiffs' Motion For Summary Judgment is denied and Defendant's Cross Motion for Summary Judgment is granted. The Clerk is directed to dismiss the complaint and enter judgment in favor of defendant. Costs to be borne by each party.

---

**4.** *Douglas v. United States,* 217 Ct.Cl. 97, 576 F.2d 887 (1978), cited by plaintiffs, is therefore inapposite. That case involved a voluntary sale rather than a condemnation. As a precondition to the sale, the landowner had to pay off existing encumbrances.